**Supreme Court**

No. 2011-242-Appeal.
No. 2011-245-Appeal.
(PC 08-3953)

Jose Bustamante et al.      :

v.      :

Hector R. Oshiro, M.D. et al.      :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2011-242-Appeal.
No. 2011-245-Appeal.
(PC 08-3953)

|                              |   |
|------------------------------|---|
| Jose Bustamante et al.       | : |
| v.                           | : |
| Hector R. Oshiro, M.D. et al.| : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.** The plaintiffs, Jose Bustamante (Jose) and his wife, Ana (Ana)[1] (collectively, plaintiffs), appeal from the entry of summary judgment in favor of the defendants, Hector R. Oshiro, M.D. (Dr. Oshiro), Samuel Greenblatt, M.D. (Dr. Greenblatt), Peter E. Baziotis, M.D., Alexander P. Robertson, M.D. (Dr. Robertson), Scott M. Levine, M.D. (Dr. Levine), Primary Care Medical Associates, Inc., Anesthesia Care, Inc., University Orthopedics, Inc., and Rhode Island Medical Imaging, Inc. The plaintiffs contend that the trial justice erred in declaring that the statute of limitations had run on the plaintiffs' medical-malpractice claims and that the action therefore was time-barred. After careful consideration, we affirm the judgment of the Superior Court.

---

[1] The plaintiffs' complaint refers to Ana as "Anna Bustamante." However, during her deposition, Ana testified that her name is "Ana Gaviria" and that she never has used the name "Anna Bustamante." Similarly, in her interrogatory answers, Ana gave the name "Ana Gaviria." In light of this discrepancy, we shall refer to her as "Ana." The plaintiffs' complaint alleges that Ana has suffered "the loss of services, companionship, society, and comfort of her husband, Jose," as a result of defendants' malpractice; her claim is thus derivative.

- 1 -

**Facts and Travel**

Save for the penultimate issues of liability and damages, the facts of this case are undisputed. The record discloses that, in October 2003, Jose was experiencing neck pain for which he visited his primary care physician, Dr. Oshiro. Doctor Oshiro ordered a cervical spine X-ray and a magnetic resonance imaging (MRI) examination, the results of which were interpreted by Dr. Levine in April and May 2004. The interpretation of these results by Dr. Levine did not reveal any mass or tumor in Jose's neck. Additionally, Dr. Oshiro referred Jose to Dr. Greenblatt, a neurosurgeon, and Dr. Robertson, an orthopedic surgeon. Doctor Greenblatt examined Jose and the X-ray and MRI examination results in June 2004, and he concluded that Jose's symptoms were not neurological in nature. After reviewing the MRI results in November 2004, Dr. Robertson advised Jose that his symptoms were the result of degenerative disc disease.

Unsatisfied with these assessments and in the face of continuing symptoms, Jose sought a second opinion from Ivan Castano, M.D. (Dr. Castano), in Miami, Florida. An additional MRI examination was ordered in late May 2005, which revealed a mass in Jose's neck. The report accompanying that examination indicated the following: "Common differential considerations include chordoma, other primary or metastatic bone tumor, rheumatoid arthritis or infection. Further characterization with CT of the cervical spine is suggested." Doctor Castano concluded that this mass was a cervical tumor, and he discussed this diagnosis and the results of the latest MRI examination with Jose and Ana on June 2, 2005.

Six days later, on June 8, 2005, Jose was admitted to Jackson Memorial Hospital in Miami, Florida. A "consultation note," dated that same day, stated that "the appearance [of the mass] is consistent with a primary bone tumor such as a plasmacytoma or chordoma[;] however, numerous other diagnostic possibilities exist." On June 10, 2005, Jose underwent surgical

resection of the tumor. Analysis of the excised tumor on the same day revealed that it was plasmacytoma, a form of cancer. The plaintiffs allege that Jose did not learn of the diagnosis of cancer until "on or about June 21, 2005," after he was discharged from intensive care.

On June 9, 2008, plaintiffs filed a complaint, alleging multiple counts of negligence and lack of informed consent against the several doctors, and their employers, who had treated Jose in Rhode Island before Dr. Castano discovered the tumor. The gravamen of plaintiffs' allegations was that defendants failed to diagnose and treat Jose's cancer.

The defendants moved for summary judgment, arguing that plaintiffs' suit was time-barred by the three-year statute of limitations for medical malpractice, G.L. 1956 § 9-1-14.1. The basis of this claim was that plaintiffs became aware of the alleged acts of malpractice on June 2, 2005, when Dr. Castano informed Jose and Ana that a tumor had been discovered in Jose's neck. To support this contention, defendants pointed to Ana's deposition testimony, in which she agreed with defense counsel that she first believed that Dr. Oshiro, Dr. Greenblatt, and Dr. Robertson "had done something wrong" when Dr. Castano told plaintiffs about the existence of the tumor. The defendants also relied on the following exchange that occurred during Jose's deposition: when asked, "Then when you were told about the mass on June 2, 2005, you felt that that was the mass—that was the problem that should have been diagnosed by Dr. Greenblatt, Dr. Robertson, and Dr. Oshiro, correct?," Jose responded, "100 percent." The defendants argued that this testimony, like Ana's testimony, established that Jose believed, as of June 2, 2005, that defendants had done something wrong. Similarly, defendants highlighted Jose's response to one of defendants' interrogatories, which asked for "the date on which you or anyone on your behalf first became aware of the fact that you had been harmed as a result of the defendant's conduct * * *." Jose's answer read, "I found out I had a tumor at the base of my spine I believe in May

- 3 -

or June of 2005 through Dr. Ivan Castano that my previous medical providers failed to diagnose."[2] The defendants noted that Ana gave a similar answer to that interrogatory request. The defendants argued that this evidence demonstrated that, as of June 2, 2005, plaintiffs were aware of facts that would place a reasonable person on notice that a potential claim exists.

In opposition, plaintiffs argued that the statute of limitations did not begin to run until, at the earliest, June 10, 2005, when the tumor was discovered to be cancerous following Jose's surgery. The plaintiffs emphasized that the report from the second MRI examination indicated that follow-up tests were required to determine whether the tumor was cancerous or the result of noncancerous conditions, such as rheumatoid arthritis or infection. Additionally, plaintiffs disputed the significance of Jose's deposition testimony. Although Jose acknowledged that he was told about the mass in his neck on June 2, 2005 and that he believed that it should have been diagnosed by defendants, plaintiffs argued that this testimony did not establish that, as of June 2, 2005, he was aware that defendants had done something wrong; at most, it established that Jose reached this conclusion at some point after discovering there was a mass in his neck. To support this contention, plaintiffs pointed to the following portion of Jose's deposition testimony:

> "[Defense Counsel]: As of that date of that visit [June 2, 2005], were you thinking back to the treatment you had received in Rhode Island and their failure to find this mass?
>
> "[Plaintiffs' Counsel]: Objection.
>
> "[Jose]: I don't think I was thinking of that. I was thinking what had to be done in order to get me better.

---

[2] More than two months after defendants first moved for summary judgment under Rule 56 of the Superior Court Rules of Civil Procedure, Jose amended this interrogatory answer to read as follows: "I found out that I had a <u>cancerous</u> tumor at the base of my spine when I got out of Intensive Care after my surgery—on or about June 21, 2005—that my previous medical providers failed to diagnose." (Emphasis added.)

"[Defense Counsel]: You knew as of that visit that you had a—this was a serious issue, correct?

"[Jose]: At that particular time I didn't realize that that was serious, but I realize [sic] it when I went to Dr. Guerrero and he told me that he could not see me, that I had to go to another doctor."[3]

Likewise, plaintiffs argued that Ana's deposition testimony as to what she believed on June 2, 2005 could not answer the question of whether Jose was aware of possible negligence at that point.

The trial justice granted summary judgment in favor of defendants. The trial justice declared that "[i]t is clear that [Jose] and [Ana], in particular [Jose], became aware of the previously undiagnosed tumor on June 2nd, 2005. At that point, the plaintiffs were undoubtedly aware of the facts that would place a reasonable person on notice that a potential claim exists * * *." She therefore concluded that the statute of limitations began to run on June 2, 2005 and had expired before plaintiffs filed suit on June 9, 2008. Accordingly, summary judgment entered in favor of defendants. The plaintiffs appealed.

### Standard of Review

"[T]his Court reviews a grant of summary judgment de novo." Sacco v. Cranston School Department, 53 A.3d 147, 149-50 (R.I. 2012) (quoting Moore v. Rhode Island Board of Governors for Higher Education, 18 A.3d 541, 544 (R.I. 2011)). Viewing "the evidence in the light most favorable to the nonmoving party," we will affirm the judgment only if there exist "no genuine issues of material fact and * * * the moving party is entitled to judgment as a matter of law." Id. at 150 (quoting Moore, 18 A.3d at 544).

---

[3] In his deposition, Jose testified that Dr. Castano referred him to Dr. Guerrero "within two or three days" after the discovery of the tumor.

**Analysis**

In Rhode Island, a cause of action for medical malpractice is subject to the three-year statute of limitations set forth in § 9-1-14.1. Generally, a medical-malpractice claim must be brought within three years of the date of the alleged act of malpractice. Section 9-1-14.1 ("[A]n action for medical * * * malpractice shall be commenced within three (3) years from the time of the occurrence of the incident which gave rise to the action * * *."). However, this general rule is not absolute; § 9-1-14.1(2) codifies the discovery rule for a subset of malpractice cases:

> "In respect to those injuries or damages due to acts of medical * * * malpractice which could not in the exercise of reasonable diligence be discoverable at the time of the occurrence of the incident which gave rise to the action, suit shall be commenced within three (3) years of the time that the act or acts of the malpractice should, in the exercise of reasonable diligence, have been discovered."

We have explained that "[t]he discovery date is the date that the plaintiffs knew or should have known of the 'wrongful act' that is the basis of their lawsuit." Hanson v. Singsen, 898 A.2d 1244, 1249 (R.I. 2006) (quoting Ashey v. Kupchan, 618 A.2d 1268, 1269 (R.I. 1993)). Any analysis under the discovery rule employs an objective standard: "If a reasonable person in similar circumstances should have discovered that the wrongful conduct of the defendant caused [his or] her injuries as of some date before the plaintiff alleged that [he or] she made this discovery, then the earlier date will be used to start the running of the limitations period." Id. (quoting Martin v. Howard, 784 A.2d 291, 300 (R.I. 2001)); see also Moore, 18 A.3d at 544-45. "In keeping with the remedial spirit of the rule, this Court draws 'all reasonable inferences' in [the] plaintiff's favor to determine whether, in the exercise of reasonable diligence, [the] plaintiff should have discovered the alleged act of malpractice." Canavan v. Lovett, Schefrin and

Harnett, 862 A.2d 778, 784 (R.I. 2004) (quoting Richmond Square Capital Corp. v. Mittleman, 689 A.2d 1067, 1069 (R.I. 1997) (mem.)).

In this case, the parties do not dispute that the discovery rule applies to plaintiffs' claims. Rather, the only dispute is the precise date on which the three-year period began to run—that is, the date on which the alleged "acts of the malpractice should, in the exercise of reasonable diligence, have been discovered." Section 9-1-14.1(2). The defendants assert that the operative date is June 2, 2005, when Dr. Castano informed plaintiffs of the tumor that was discovered in the May 2005 MRI examination. The plaintiffs counter that the statute did not begin to run until, at the earliest, June 10, 2005, when, after Jose's surgery, the cancerous nature of the tumor was discovered.

Having carefully canvassed the entire record, as we are bound to do, we are of the opinion that the statute of limitations began to run on June 2, 2005, when Dr. Castano informed plaintiffs that Jose had a tumor in his neck that Dr. Castano suspected was a cervical tumor. The undisputed facts establish that Jose underwent a MRI examination in late May 2005 that revealed a previously undiagnosed mass in his neck; Dr. Castano diagnosed the mass as a cervical tumor, and he related this diagnosis and the MRI results to Jose and Ana on June 2, 2005.[4] On these undisputed facts, we conclude that a reasonable person would have discovered the wrongful conduct of defendants on June 2, 2005. See O'Sullivan v. Rhode Island Hospital, 874 A.2d 179,

---

[4] At oral argument, plaintiffs appeared to dispute, for the first time, whether, during his June 2, 2005 consultation with plaintiffs, Dr. Castano related his diagnosis that the mass found in Jose's neck was a cervical tumor. However, plaintiffs conceded that Dr. Castano's records of the June 2, 2005 consultation with Jose and Ana contained the phrase "cervical tumor." Additionally, Jose admitted in his deposition that, on June 2, 2005, Dr. Castano told him that he had a mass in his neck. Moreover, plaintiffs state in their brief that "on June 2, 2005, * * * the Bustamantes first became aware of a previously undiagnosed tumor, a tumor of a still-unknown nature." (First emphasis added.)

- 7 -

182-83 (R.I. 2005) (explaining that, where the material facts are undisputed, the viability of a particular statute-of-limitations defense appropriately is decided at the summary-judgment stage); see also Hanson, 898 A.2d at 1248 ("The application of the statute of limitations is a matter of law for the trial justice to determine." quoting Ashey, 618 A.2d at 1270); Dionne v. Baute, 589 A.2d 833, 835 (R.I. 1991). Therefore, the trial justice correctly determined that plaintiffs' complaint was time-barred.

We reach this conclusion without resort to those portions of the depositions of Jose and Ana where each appear to indicate that they believed, as of June 2, 2005, that defendants had done something wrong. Although Ana agreed with defense counsel that she first believed that Dr. Oshiro, Dr. Greenblatt, and Dr. Robertson had done something wrong when Dr. Castano told plaintiffs about the existence of the tumor, there is no evidence warranting attribution of that belief to Jose.

With respect to Jose's deposition testimony, defense counsel asked, "Then when you were told about the mass on June 2, 2005, you felt that that was the mass—that was the problem that should have been diagnosed by Dr. Greenblatt, Dr. Robertson, and Dr. Oshiro, correct?" Although Jose responded, "100 percent[,]" the clarity of the inquiry and the answer that was given are subject to debate.[5] Therefore, having viewed this evidence in the light most favorable to Jose, we resolve this discrepancy in Jose's favor. See Canavan, 862 A.2d at 784 ("In keeping with the remedial spirit of the [discovery] rule, this Court draws 'all reasonable inferences' in [the] plaintiff's favor * * *." quoting Richmond Square Capital Corp., 689 A.2d at 1069).

---

[5] The question was long and halting, and one reasonable interpretation of Jose's response is that, on June 2, 2005, he felt "100 percent" that the mass was the problem that should have been diagnosed by defendants. One could also interpret Jose's response as simply conveying that he felt "100 percent" that the mass was the problem that should have been diagnosed by defendants, not that he felt this way on June 2, 2005 in particular.

Ultimately, whether Ana or Jose subjectively suspected that defendants had done something wrong is of scant relevance in the discovery-rule analysis, which focuses on the determination of "the time that the act or acts of the malpractice should, in the exercise of reasonable diligence, have been discovered." Section 9-1-14.1(2) (emphases added); see also Hanson, 898 A.2d at 1249 ("If a reasonable person in similar circumstances should have discovered that the wrongful conduct of the defendant caused [his or] her injuries as of some date before the plaintiff alleged that [he or] she made this discovery, then the earlier date will be used to start the running of the limitations period." quoting Martin, 784 A.2d at 300 (emphasis added)).[6]

Furthermore, we conclude that plaintiffs' reliance on this Court's decision in Zuccolo v. Blazar, 694 A.2d 717, 717-19 (R.I. 1997), is misplaced and does not support the contention that the statute of limitations did not begin to run until, at the earliest, June 10, 2005. In Zuccolo, 694 A.2d at 718, the defendant-doctors prescribed the plaintiff a steroid without disclosing the known possible side effect of avascular necrosis, a disease of the joints. When, in 1985, after taking the steroid for several months, the plaintiff experienced joint swelling, his general practitioner—who was not a defendant—recommended that, as a precautionary measure, the plaintiff cease ingesting the medication. Id. The plaintiff's doctor "never specifically diagnosed avascular necrosis as being the cause of the swelling." Id. The plaintiff followed his doctor's advice, but

---

[6] We similarly attach no significance to plaintiffs' supplemental interrogatory answers. In response to one of defendants' interrogatories that asked for "the date on which you or anyone on your behalf first became aware of the fact that you had been harmed as a result of the defendant's conduct," Jose answered, "I found out I had a tumor at the base of my spine I believe in May or June of 2005 through Dr. Ivan Castano that my previous medical providers failed to diagnose." Although plaintiffs subsequently amended this answer to read, "I found out that I had a cancerous tumor at the base of my spine when I got out of Intensive Care after my surgery—on or about June 21, 2005—that my previous medical providers failed to diagnose[,]" this amended answer does not in any way contradict the undisputed record evidence that Jose and Ana met with Dr. Castano on June 2, 2005 and were informed then that Jose had a mass in his neck.

he nonetheless sought to discover the cause of his swelling joints. Id. Suspecting that his problems were related to the steroid, he contacted three different rheumatologists; all three diagnosed him with rheumatoid arthritis instead. Id. The plaintiff then contacted a fourth rheumatologist in December 1988 and received a MRI examination that revealed, for the first time, that the plaintiff was suffering from avascular necrosis of the hips. Id. This rheumatologist "ambiguously suggested that the avascular necrosis 'can be secondary to your [the plaintiff's] rheumatoid arthritis or even related to previous medication.' [He] did not specifically mention [the plaintiff's] use of [the steroid] as a possible cause of the avascular necrosis." Id. The plaintiff filed suit on July 31, 1991, and summary judgment entered in favor of the defendant-doctors on statute-of-limitations grounds. Id.

This Court vacated the entry of summary judgment. Zuccolo, 694 A.2d at 719. We held that "the December 1988 MRI scan * * * first alerted [the plaintiff] to the alleged wrongful conduct of the defendants * * *." Id. The fact that the plaintiff had suspected a connection between his swelling joints and the steroid before the MRI examination did not impact our conclusion because "that suspicion had never been confirmed by, and in fact had been explicitly contradicted by, the diagnoses given by the numerous experts retained by [the plaintiff]." Id. Similarly, the fact that the fourth rheumatologist's diagnosis was ambiguous as to the cause of the avascular necrosis and did not mention any connection with the steroid was of no moment to our determination that the statute of limitations began to run after the MRI examination in December 1988: "The results [of the MRI examination] were the first indication to [the plaintiff] of any connection between his use of [the steroid] and his joint problems. * * * [The plaintiff's] diligence and persistence were rewarded when the results of his MRI scan came back and finally

indicated a <u>possible</u> connection between the [steroid] and his joint problems." <u>Id.</u> (Emphases added.)

The critical, and indeed fatal, difference between <u>Zuccolo</u> and this case, however, is the time it took to file the complaint <u>after</u> discovering the possible connection between the injury and the defendants' malpractice. In <u>Zuccolo</u>, 694 A.2d at 719, the plaintiff filed suit on July 31, 1991, well "within three years of the December 1988 MRI scan that first alerted [the plaintiff] to the alleged wrongful conduct of the defendants * * *." In this case, by contrast, plaintiffs filed their complaint on June 9, 2008, more than three years after their discovery of the mass in Jose's neck and Dr. Castano's diagnosis of the mass as a cervical tumor on June 2, 2005.

The plaintiffs argue that the date that the cancer diagnosis was confirmed—rather than the date plaintiffs were informed of the tumor—should be the discovery date for statute-of-limitations purposes. To be sure, the cancerous nature of the mass in Jose's neck was far from certain on June 2, 2005. The report accompanying the May 2005 MRI examination indicated several diagnostic possibilities: "Common differential considerations include chordoma, other primary or metastatic bone tumor, rheumatoid arthritis or infection. Further characterization with CT of the cervical spine is suggested." Similarly, a "consultation note," dated June 8, 2005, stated that "the appearance [of the mass] is consistent with a primary bone tumor such as a plasmacytoma or chordoma[;] however, numerous other diagnostic possibilities exist."

This fact, however, is not dispositive. The discovery rule does not require perfect crystallization of the nature and extent of the injury suffered or a clear-cut anchoring to the allegedly negligent conduct of a defendant. Rather, a medical-malpractice plaintiff is afforded three years to commence suit from "the time that the act or acts of the malpractice should, in the exercise of reasonable diligence, have been discovered." Section 9-1-14.1(2).

- 11 -

Our decision in Zuccolo is instructive in this regard. In that case, the MRI examination revealed avascular necrosis, but the rheumatologist "ambiguously suggested" that it could be secondary to the plaintiff's previously diagnosed rheumatoid arthritis or related to medication. Zuccolo, 694 A.2d at 718. Moreover, the rheumatologist did not mention the steroid as a potential cause of the avascular necrosis. Id. Instead, we noted that the MRI examination in 1988 was "the first indication * * * of any connection" between the steroid and the injury and that this examination revealed only "a possible connection" at that. Id. at 719 (emphases added). Nonetheless, we determined that the date of the December 1988 MRI examination was the date on which the statute of limitations began to run: "[S]ince [the plaintiff] filed his complaint within three years of the December 1988 MRI scan that first alerted [the plaintiff] to the alleged wrongful conduct of the defendants, his action was not barred by the statute of limitations." Id.

So it is here. Although the report accompanying the MRI results revealed that the mass could be a product of rheumatoid arthritis or infection, it also indicated that the mass could be "chordoma, [or] other primary or metastatic bone tumor." Jose had been examined by several doctors over a span of more than a year and a half for his persistent neck pain; and, dissatisfied with the diagnoses he had received to that point, he sought yet another opinion on the source of his neck pain. When the subsequent MRI examination revealed a mass in his neck, which Dr. Castano diagnosed as a cervical tumor, and the diagnosis and MRI examination results were shared with plaintiffs on June 2, 2005, "a reasonable person in similar circumstances [would] have discovered that the wrongful conduct of * * * defendant[s] caused [Jose's] injuries * * *." Hanson, 898 A.2d at 1249 (quoting Martin, 784 A.2d at 300). The three-year statute of limitations therefore began to run on that date.

In reaching this conclusion, we are mindful that the plaintiffs will not have their day in court. Nevertheless, although the strength of a plaintiff's interest in seeking recompense for injuries caused by the wrongs of others cannot be gainsaid, a defendant in a malpractice case has a countervailing interest in repose. See Ryan v. Roman Catholic Bishop of Providence, 941 A.2d 174, 180 (R.I. 2008) ("Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs." quoting Wood v. Carpenter, 101 U.S. 135, 139 (1879)). Statutes of limitation "are the product of a balancing of the individual person's right to seek redress for past grievances against the need of society and the judicial system for finality—for a closing of the books." Id. at 181. The General Assembly legislatively has struck this balance in § 9-1-14.1. It is not a function of this Court to disrupt this equilibrium by excusing a party's untimeliness, even though we are sympathetic to the plaintiffs' ordeal.

**Conclusion**

For the reasons articulated above, we affirm the judgment below. The papers may be remanded to the Superior Court.



**TITLE OF CASE:**        Jose Bustamante et al. v. Hector R. Oshiro, M.D. et al.

**CASE NO:**        No. 2011-242-Appeal.
No. 2011-245-Appeal.
(PC 08-3953)

**COURT:**        Supreme Court

**DATE OPINION FILED:**  May 15, 2013

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**WRITTEN BY:**        Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Sara Taft-Carter

**ATTORNEYS ON APPEAL:**

For Plaintiffs:  Miriam Weizenbaum, Esq.

For Defendants:  Paul F. Galamaga, Esq.
George E. Wakeman, Jr., Esq.
John D. Plummer, Esq.